**REA EXPRESS, INC., Plaintiff,**

v.

**INTERWAY CORPORATION and Integrated Container Service, Inc., Defendants.**

**No. 73 Civ. 560.**

United States District Court, S. D. New York.

Jan. 20, 1976.

---

Wolf, Block, Schorr & Solis-Cohen by Franklin Poul, Judith R. Cohn, Philadelphia, Pa., Michael Martell, New York City, for plaintiff.

Winthrop, Stimson, Putnam & Roberts by Stephen A. Weiner and John F. Pritchard, New York City, for defendants.

1. Prior to May 1971, Interway was known as Integrated Container Service Industries Corporation ("ICSI"). As used in this opinion, Interway refers to the parent corporation both during and after the time it was known as ICSI.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By its amended and supplemental complaint, plaintiff REA Express, Inc. ("REA") seeks to recover damages under three separate counts against defendants Interway Corporation [1] ("Interway") and its wholly-owned subsidiary, Integrated Container Service, Inc. ("ICS").

This Court has subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and principles of pendent jurisdiction.

Count I of the complaint relies upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder by the Securities and Exchange Commission ("SEC"). Plaintiff claims that in the Fall of 1968 ICS made fraudulent misrepresentations to REA, and falsely and fraudulently omitted to disclose material facts in connection with an offer, and also a subsequent agreement, to purchase the stock of REA Leasing Corporation ("Realco"), then a wholly-owned subsidiary of REA.[2]

On October 11, 1968, REA and ICS entered into a written agreement (the "Purchase Agreement") for the sale to ICS of 51% of the stock of Realco for $30,000,000.00 and for the sale to ICS of $2,400,000.00 of 5½% subordinated debentures at par value, representing money which Realco owed REA plus accrued interest from October 1, 1968. The interest amounted to $11,000.00. (Joint Exhibit No. 107).

In a letter of the same date ("Letter Agreement"), REA received an option, good until July 11, 1969, to "put", or sell any or all of the remaining 49% of the Realco stock to Interway for a total consideration of 440,000 shares (or a proportionate amount thereof) of preference stock of Interway, which was to be con-

2. The full name of Realco is now Realco Services Incorporated.

vertible into Interway common on the basis of 1.5 shares of common stock for each share of preferred. The closing took place on November 1, 1968, at which time ICS purchased 51% of the stock of Realco and the subordinated debentures, and paid the cash consideration specified in the Purchase Agreement.

Counts II and III, pleaded in the alternative, are based upon the alleged breach by Interway of an agreement with REA to register with the SEC common stock of Interway obtainable by REA upon the conversion by it of shares of Interway preference stock which REA received as part of the consideration for the sale of certain of its shares of Realco. These counts differ only as to the theory of damages claimed.

Defendants counterclaimed for damages arising out of alleged breaches by REA of representations and warranties contained in the Purchase Agreement executed by REA and ICS on October 11, 1968.

The action was tried before me without a jury on March 3, 4 and 5, 1975. Post trial briefs have been submitted and considered.

REA is a Delaware corporation which, prior to June 1968, was known as Railway Express Agency, Incorporated, having its principal place of business in New York, New York. Since its incorporation in 1928 it has been engaged primarily in the business of providing expeditious door-to-door transportation, primarily for small shipments. Until 1969, all of the outstanding capital stock of REA was owned, directly or indirectly, by approximately 60 Class I railroads.

Prior to November 1, 1968, REA owned all of the outstanding capital stock of Realco. Since that date Interway has acquired 100% of Realco. At all relevant times, Realco has been in the business of leasing trailers, primarily to railroads, for their "trailer-on-flat-car" service, commonly known as "piggybacking".

Interway is a Delaware corporation which also has its principal place of business in New York, New York. It owns all of the stock of ICS, Realco, and certain other subsidiaries. It conducts no business of its own.

Defendant ICS is also a Delaware corporation, and is the successor to Integrated Container Service, Inc., a Pennsylvania corporation, incorporated in 1962. In October 1968, this Pennsylvania corporation transferred its assets and business (subject to its liabilities) to ICS in return for all of the capital stock of ICS. The Pennsylvania corporation was then merged into Interway and in conjunction therewith its shareholders exchanged their shares for Interway shares. At all relevant times ICS and its predecessor, Integrated Container Service, Inc. in Pennsylvania, has been in the business of leasing to others (primarily ship owners) cargo containers and accessory equipment used by ocean carriers for the transportation of freight.[3]

On January 15, 1969, REA exercised part of its option by electing to sell an additional 13% of the Realco stock to Interway. The preferred stock of Interway which REA received was converted into common stock and sold as part of a public offering of Interway common stock in March 1969. From this sale REA realized $7,865,316.00 after expenses.

On June 23, 1969, after some negotiations leading to a slight modification of the original agreement, REA exercised the balance of its option, and Interway obtained the remaining 36% of the Realco stock in exchange for $4,714,290.00 in cash, and the issuance to REA of 143,673 shares of Interway convertible preferred stock. This latter stock was unregistered. REA subsequently received 21,552 additional shares of this unregistered convertible preference stock as stock dividends on the 143,673 shares.

In June 1971, acting pursuant to the rights specifically granted to it at page 4

3. As used herein ICS refers to the particular operating corporation which was conducting business during the time period suggested by the context.

of the Letter Agreement of October 11, 1968 (Joint Exhibit No. 109), REA requested by letter that Interway register with the SEC the common stock of Interway which REA would receive upon the conversion by it of all the Interway preferred stock it then held. No such registration was ever made. However, in February 1974 Interway purchased REA's total holdings of 165,225 shares of convertible preferred for $2,726,212.00, with REA paying $25,000.00 to a third party for services rendered in arranging the sale.

*Count I—the Rule 10b–5 claim.*

The plaintiff has shown that ICS's offer contained affirmative material misrepresentations, and that ICS's management was reckless in making these statements. However, there is no credible evidence that the plaintiff or its advisors relied on the misrepresentations in making the decision to accept ICS's offer over the competing bids.

■ In relation to its Rule 10b–5 claim, it should be noted that REA can be considered either as a defrauded *seller* of Realco stock or as a defrauded *purchaser* of an option to buy shares of Interway convertible preferred. See *Zeller v. Bogue Electric Manufacturing Corp.,* 346 F.Supp. 651, 654, n. 4 (S.D.N.Y.1972), *rev'd. on other grounds* 476 F.2d 795 (2d Cir.), *cert. denied* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). Since, under either view the misrepresentations were made in connection with the purchase or sale of a security, there can be no doubt that Rule 10b–5 is applicable to this transaction. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). For purposes of clarity and consistency, REA will be referred to as a "seller" who accepted ICS's offer to purchase the stock of Realco.

On September 23, 1968 ICS submitted two offers in the alternative to purchase a controlling interest in Realco. In its letter to REA, which was hand delivered within New York State, transmitting the offers, ICS made the following statement (Joint Exhibit No. 78, p. 2): "Based upon the current demand for the Company's equipment and services, ICS anticipates that equipment in use in its pool will at least double in 1969." At page 7 of the same letter, in connection with the preparation of an exhibit showing the effect of combining the earnings of ICS and Realco, ICS stated: "Based on its forecasts, its experience and evaluation of the market available to it, ICS anticipates net earnings after taxes in excess of $2,000,000 for the current calendar year and in excess of $4,000,000 in 1969."

In fact, as events later showed, the value or amount of the equipment in use did not come near doubling in 1969, and the historic growth pattern of ICS came to an abrupt halt. Furthermore, after-tax earnings for 1969 were only $1,793,-000.00, of which all but $324,100.00 was attributable to the earnings of Realco.

I find and conclude that these are serious discrepancies and amount to affirmative material misrepresentations. While the mere fact that a forecast is inaccurate does not make it fraudulent, 1 A. Bromberg, Securities Law: Fraud, SEC Rule 10b–5, § 5.3 at p. 98 (1974), the evidence shows, and I find, that these particular forecasts were untrue statements of fact. These projections must be regarded and interpreted as a representation that in September, 1968, it was the informed, reasonable and sincere belief of ICS management that both equipment in use and earnings would double in 1969. Such a statement implies that ICS used a reasonable method of calculation and that the figures which were arrived at and furnished to REA had a valid basis. The making of such projections is a normal function of modern corporate management. The evidence shows that these forecasts were based on out-of-date computations.

The latest projections for 1969 had been made in a five-year forecast drawn up in 1967, and there was sufficient information known to ICS to show that by the Fall of 1968 business conditions were beginning to change so as to make this

1967 forecast obsolete. Furthermore, there had been no recent analysis of ICS's business prospects. Mr. Needleman, the controller of ICS who was usually responsible for drawing up such forecasts, testified at his deposition that no new projections for 1969 were asked for from him by top management, in connection with the statements made in the offer to REA. Finally, from the absence of any workpapers in its files, it is reasonable to conclude that Price Waterhouse, ICS's accountants, did not participate in the preparation of these forecasts.

The inference naturally follows, and the Court infers from the entire testimony that these figures were not arrived at in a rational fashion but were thrown in to make the ICS offer more attractive to REA than the competing offers.

■ Absent a reasonable method of preparation or a valid basis, reckless and unfounded statements as to future earnings and future acquisitions of equipment are sufficiently misleading to be actionable under Rule 10b–5. *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 490 (9th Cir. 1974); *Schuller v. The Slick Corporation*, CCH Sec.Law Rptr. ¶ 95,065 at p. 97,739 (S.D.N.Y. April 3, 1975).

While the plaintiff has alleged that ICS failed to disclose material facts concerning its business in its offering letter, based upon all of the evidence, the Court finds that there were no material omissions. The factors which led to a downturn of ICS's business in 1969 (the lengthy longshoremen's strike, the Army's cancellation of a big contract, and the increase in interest rates) were neither known to nor were foreseeable by ICS's management in the Fall of 1968.

■ There is sufficient evidence of the use of interstate means to satisfy the requirements of Rule 10b–5. Although the actual offer to purchase the Realco stock was hand delivered to REA's corporate offices in New York City where ICS was also located, I find that Mr. Pedersen, the secretary of ICS whose of-

fice is in Chicago, Illinois, spoke on the telephone with top ICS management in New York in furtherance of the offer. In addition, Mr. Pedersen travelled from Chicago to New York in order to work on the draft of the ICS offer, which resulted in the sale of securities by REA to Interway. Furthermore, meetings between REA, Realco and ICS management personnel were arranged by intrastate telephone calls in New York. Since Rule 10b–5 concerns the use of any instrumentality *of* interstate commerce, even an intrastate telephone call will satisfy the jurisdictional requirement, as all telephone lines are integral parts of an interstate network. *Kerbs v. Fall River Industries*, 502 F.2d 731, 737–38 (10th Cir. 1974); *Myzel v. Fields*, 386 F.2d 718, 727 (6th Cir. 1967).

Since there is insufficient credible evidence to support such a finding, I decline to find that the letter which Michael Kluge, President of ICS sent on October 4, 1968 to Ray Jordan, the President of REA, which modified in several important respects the initial hand-delivered offer of September 23rd, was delivered by mail.

■ Materiality, an essential element of a Rule 10b–5 claim, has also been proven here. Whether one states the test as ". . . [whether] a reasonable investor might have considered them [the facts misrepresented] important" in making his investment decision [*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381 (2d Cir. 1974)], or as "whether 'a reasonable man would attach importance [to the variance between the truth and the facts misrepresented] in determining his choice of action in the transaction in question,'" *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965), under either test there can be no doubt that both of these statements were material. See *Marx v. Computer Science Corp.*, 507 F.2d 485, 489, fn. 6 (9th Cir. 1974) for an interesting analysis of these apparent conflicting criteria for materiality.

Clearly earnings projections of a company constitute a prime factor in estimating the worth of its stock. Equipment in use usually relates historically to gross revenues; as one increases, so should the other.[4] See *Marx v. Computer Sciences Corp., supra*, at 489. For REA the price and value of the ICS stock were of critical importance. REA, which had received a number of other offers for Realco, was interested in negotiating for an option which would give it a substantial equity interest in the future of the purchaser, and Realco.

Insofar as concerns the presence of scienter, plaintiff here has shown that ICS's top management did not use a reasonable method in preparing the earnings projection which was incorporated into the September 23rd offer.

In *Republic Technology Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 551 (2d Cir. 1973), the court held:

"something short of specific intent to defraud is required and something more than 'mere' negligence; certainly, knowledge of the fact that the figures created a false picture is enough, and on the part of sophisticated corporate managers a reckless disregard of the truth is sufficient."

Facts previously found, *supra*, p. 196, that (a) the forecast was not based on a current analysis of ICS's prospects for 1969 but on an out of date projection which had been prepared in 1967; (b) ICS's own financial officers, the controller and his staff, did not prepare figures; (c) no accountant's worksheets or other source information, or statistical input by ICS operations personnel which might have been used as a basis for the projection exist; compel our finding that the figures were based not on a careful evaluation of all the factors, but on the conclusory assumption on the part of ICS's top management that there was an ever-expanding market for container leasing, and a general emotional feeling that ICS could continue its historic growth pattern, and double its earnings in 1969.

While many people did share a favorable impression of ICS and the container leasing business, it was at least reckless for ICS to use these baseless earnings projections in connection with a major corporate action such as the offer to pur-

---

4. ICS justifies its projection that a doubling of its equipment in use in 1969 would result in a doubling of net earnings by pointing to the historical growth pattern of the corporation. However, this proposition would appear contrary to elementary economic theory as well as common sense. First, there is no reason to assume without evidence that a historic growth pattern will continue uninterruptedly into the future upon an accelerated curve. As a small company gets larger, it becomes more and more difficult for it to sustain its growth rate. Furthermore, ICS had enjoyed a utilization rate of almost 100% on its equipment from its origin until the Fall of 1968. It could only expect to double its gross earnings if it could maintain this 100% rate even after doubling its revenue equipment. At some point it is obvious that market demand would simply be unable to absorb the new equipment. Either the utilization rate would decline or ICS would be forced to cut its rates. In either case gross earnings would not grow in the same proportion as equipment in use.

Secondly, and perhaps more importantly, it is overly simplistic to assume that net earnings and either gross revenues or the amount of equipment in use are inexorably linked together so that doubling one will automatically double the other. On one hand, as a business like ICS grows, it may experience economies of scale. Such economies of scale are cost savings which a firm enjoys within a certain range of gross rentals by being able to exploit more fully its developed techniques for marketing and performing the service it provides for customers. Such cost savings may allow a larger firm to earn greater profit on each rental unit than the smaller firm. On the other hand, a point will be reached in any company's growth, where its unit costs will begin to rise again. Greater size often means new unexpected inefficiencies and higher fixed costs. Management may become more and more insulated from the realities of the sales and service effort and develop unrealistic expectations. Corporate bureaucracies become unwieldy and failures of communication occur with increasing frequency. All of these factors help force up costs per unit as the firm expands beyond an efficient size. The point is, of course, that due to these inevitable technological and managerial inefficiencies net earnings will not grow at the same pace as output and may in fact begin to decline. See *Areeda*, Antitrust Analysis, ¶ 125, at p. 27 (2d ed. 1974).

chase Realco in part with Interway stock.

■ Plaintiff contends that it need not actually prove it relied on the misleading statements made by ICS. The factual situation here involves basically affirmative misrepresentations, as opposed to omissions. We have here face-to-face dealings between sophisticated, well-advised corporate managers, rather than impersonal dealings among investors in an auction market. In this action proof of actual reliance on a false statement is an essential prerequisite to recovery on a Rule 10b–5 claim. Precedents cited by plaintiff do suggest a loosening of the traditional strict test of reliance in certain types of Rule 10b–5 cases, but none of them are controlling on the facts here. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) involved "primarily a failure to disclose" and the Supreme Court stated: "Under the circumstances of this case . . . positive proof of reliance is not a prerequisite to recovery." REA has proven here two misrepresentations, rather than misleading omissions or a "failure to disclose."

In *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975), a grant of summary in favor of defendants was reversed. The Court held that where "both misrepresentations and omissions are alleged to be only one aspect of an elaborate scheme to defraud," the plaintiff need not prove direct reliance upon false financial statements. *Id.* at 814. Here the plaintiff has neither proven nor even alleged any "elaborate scheme to defraud."

More on point than these cases cited by plaintiff is *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir. 1975), a case which involved both misrepresentations and misleading omissions. The Court of Appeals considered each such category separately. It affirmed the District Court's finding that there had been no reliance on the misrepresentations, and its conclusion that the omissions had not been material. See also, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584 (1975); *Lorber v. Beebe*, 407 F.Supp. 279 (S.D.N.Y.1975), CCH Sec.Law Rptr. ¶ 95,363.

■ I conclude that reliance must be proven under the circumstances of this case. Plaintiff has not carried its burden, and accordingly, its Rule 10b–5 claim must fall.

The evidence shows, and I find, that in mid-1968 REA was in desperate need of working capital. A deficit of more than Fifteen Million Dollars was forecast by the end of 1968, and it needed so-called "free cash" which could be used for operations, rather than paying off existing obligations. REA was losing money at the time, and the railroads which had formerly financed REA's operations were reluctant to make any more funds available.[5] Nor was the regular money market open to REA at that time.[6]

REA retained McKinsey & Co., a noted management consulting firm, to advise it on possible sources for raising cash. After a careful analysis of its current and prospective financial condition, McKinsey concluded that the sale of Realco offered REA the best opportunity to raise free cash. This conclusion was concurred in by the investment banking

---

5. For a brief history of REA and its financial difficulties see the opinion of Judge Metzner in *REA Express, Inc. v. Alabama Great Southern Railroad Co.*, 343 F.Supp. 851, 853–55 (S.D.N.Y.1972), *aff'd.* 412 U.S. 934, 93 S.Ct. 2774, 37 L.Ed.2d 393 (1973).

6. REA had an extensive history of losses and survived only through subsidies provided by the railroads which needed the services which

it provided. Indeed the very fact that the railroads were in a position to dominate REA made it an unattractive investment from the standpoint of financial institutions and the general public. McKinsey advised that unless and until REA was freed from railroad control, efforts to revive the company would be in vain. This advice was one of the prime reasons for the formation of the voting trust in June 1968.

firm of Kuhn, Loeb & Co., which had been acting as REA's financial advisor.

On July 1, 1968, REA's Board of Directors approved the written recommendation of McKinsey, and requested Kuhn, Loeb to advise REA in connection with its effort to sell all or part of Realco at the highest possible price. By letter dated August 16, 1968, REA solicited bids for the purchase of Realco from 47 different companies. In addition to the ICS offer, REA received offers from three other companies, and it requested Kuhn, Loeb to evaluate the various offers. The evidence shows and I find, that Kuhn, Loeb evaluated the ICS offer No. 2, i. e., the one which was eventually accepted, at between $59,600,000.00 and $64,400,000.00. The next highest offer was Pepsico's which was evaluated at $41,776,800.00. Kuhn, Loeb concluded that ICS's offer was the most advantageous, and it recommended that REA accept the ICS offer. McKinsey concurred in this conclusion and also recommended acceptance of the ICS offer.

Mr. John Guest, a partner in the Kuhn, Loeb firm, testified at his deposition that after the bids were received, he met with all three of the trustees, who were then running REA.[7] He told them that there was a market risk involved in acquiring ICS stock, which was then selling at a high price earnings multiple, because (1) ICS was a relatively new company, (2) the container leasing business was a relatively new industry, and (3) the stock market in general might be vulnerable to a decline. The trustees stated that they understood these three risks. I find Mr. Guest's testimony credible on this point.

The evidence shows, and I find, that REA's Board of Directors (which in the Fall of 1968 consisted of Mr. William Taylor, the Chairman, and Mr. Ray Jordan, Mr. Robert Johnson and Mr. Robert

Fuller, the three trustees) in reaching the decision to sell Realco had available to it and relied solely upon the expert advice of Kuhn, Loeb and McKinsey & Co. Mr. Guest testified, and I find his testimony persuasive on this point, that while he had seen the 1969 projections, which the Court finds reckless, he based his opinion that ICS earnings were likely to increase upon his own discussions with ICS officers and directors, and on his own independent knowledge of the container industry and its growth prospects. After the closing, Mr. Guest expressed the opinion to the trustees that the ICS offer was higher than Kuhn, Loeb had expected.

Mr. Marvin Bower, the consulting Director for McKinsey on its REA assignment, testified at his deposition that he had never seen the earnings projections contained in the offering letter of September 23rd. He further testified that McKinsey recommended acceptance of the ICS offer based on Kuhn, Loeb's opinion, and the fact that it produced the largest amount of cash, which was needed immediately in order to save REA. I find Mr. Bower's testimony credible on this point.

Thus none of the experts consulted by REA testified that they relied on the misleading statements. Even more damaging to REA's contentions here is the testimony of Mr. Johnson, one of the trustees who had responsibility for the ultimate decision. As an experienced businessman, Johnson testified that he knew that forecasts sometimes did not come true. While he had seen the 1969 projection in ICS's offering letter, he was not able to say that if this projection had been omitted, the trustees would have rejected the ICS offer and accepted the next highest bid. As other factors which induced him to accept the ICS offer, Mr. Johnson mentioned his own favorable opinion of the growth

---

7. On June 10, 1968, the railroads which owned the outstanding stock of REA had placed their holdings in a voting trust and had vested the power to vote the stock in three trustees, none of whom had previously been associated with REA. These trustees, along with Mr. William Taylor, the former President of REA, constituted the Board of Directors of REA during the relevant period, with Taylor serving as Chairman.

prospects of the container leasing business, the fact that prestigious firms such as Lehman Brothers had an interest in ICS, and the opportunity which the ICS offer gave to REA to share through its potential stock ownership in Interway, in the future prosperity of the container industry. Read most favorably to the plaintiff, Johnson's testimony falls far short of the positive proof of reliance that is necessary here.

Finally, there is the testimony of Mr. William Taylor, then Chairman of the Board of REA. While the ultimate decision to sell Realco was in the hands of the three trustees, Mr. Taylor says that he had hand-picked the trustees and he presided at their meetings. As the only man among the group experienced in the transportation field, the trustees gave weight to his advice and recommendations.[8] Taylor's testimony shows that long before Kuhn, Loeb reported its evaluation to the trustees, he had concluded that the ICS offer was far and away superior to the others, because it offered "$32.4 Million [cash] . . . plus a put for stock having considerable market value and a right to piggy-back on a secondary offering . . ." (Taylor deposition, Ex. D at p. 29). Taylor testified further, and plaintiff has failed to rebut this, that in evaluating the ICS offer, he gave virtually no weight to the earnings projection, which he knew could err in either direction. What he did rely on was his own evaluation of the container business and his analysis of the stock market. Taylor could not recall any meeting with the trustees where the ICS forecasts were specifically discussed, and he stated that even without this statement, he would have considered that, of the competing proposals, the ICS offer was best. Tested by hindsight, Mr. Taylor was right. Indeed, as it turned out, REA has received in net cash for the sale of Realco, the sum of $47,691,818.00, a figure which

is close to twenty times Realco's earnings in 1968, and exceeds by Six Million Dollars the value of the next highest offer received for Realco. (See ¶ 17 of Stipulated Facts).

I conclude that REA would have accepted ICS's offer for Realco even if the untrue statements about future earnings and equipment acquisition had not been made. The evidence shows, and I find, that given its desperate need for immediate cash to run its business, REA was in no position to reject the ICS offer, which, despite the reckless misrepresentations, was substantially better than the other offers. Indeed, to have done so would have exposed the trustees to suit for breach of fiduciary duty by the railroads, who were the beneficiaries of the voting trust.

The favorable view which REA's retained experts and its directors had of the container leasing business in general, and of ICS in particular, and the immediate need for working capital to survive, were broad policy considerations which induced REA to accept the ICS offer. The earnings projection and equipment acquisition forecast were simply details which were thrown into the discussion, as to which the evidence shows, and I find, that those acting for REA as a purchaser or seller of securities neither considered nor relied upon at the time of the transaction. Indeed, financial experts at REA, Kuhn, Loeb and McKinsey knowing the parties were engaged in arms length transactions, never asked for further clarification of these projections, or for the source materials supporting them. REA, its experts and those acting for it, did not rely on the misleading statements of ICS's projected earnings and equipment acquisition plans for 1969. Accordingly, plaintiff has not proven a causal link between ICS's statements and its alleged injury. As to Count I, defendants are entitled to judgment.

---

8. Robert Johnson had been Chairman and Chief Executive Officer of Ingersoll-Rand Corporation, which supplies capital goods to the railroad industry, but was not itself in the transportation business. Ray Jordan was the President of J. C. Penney & Co., and Robert Fuller was Senior Vice President of the First National City Bank.

*Counts II and III.*

█ Counts II and III plead alternative theories with respect to the damages allegedly suffered by REA resulting from the failure of Interway to effect a registration of REA's Interway shares as it had agreed to do. Interway's obligation to register the common stock on conversion of the convertible preferred shares was not breached where the written consents of the holders of record of the preferred shares was not obtained and these holders had their own reasons not to convert.

The October 11th Letter Agreement by which REA accepted ICS's offer to purchase Realco contained the following provision (at pp. 3–4):

> "ICS agrees that, at any time and from time to time following an acceptance by REA of all or any part of your additional offer or following the written notice of REA of intent to accept all or any part of such offer on or after the time the registration statement hereinafter referred to becomes effective, upon the written request of REA, ICS will, at its expense . . . use its best efforts to register not less than the number of shares of ICS Common Stock (to be received by REA on conversion of the Preferred Stock) so requested to be registered under the Securities Act of 1933 . . . , and to keep such registration effective for a period of at least nine months."

Pursuant to this provision, by letter dated June 14, 1971, REA requested Interway to register under the Securities Act of 1933 the common stock which it would receive upon conversion of the 158,041 shares of Interway convertible preferred which it then held. The parties have stipulated that as of June 14, 1971, the holder of record of one-half of these preference shares was Kugler & Co., and the rest were held of record by Carr & Co.

. Kugler & Co. was the nominee of Morgan Guaranty Trust Company of New York ("Morgan"). The stock was held by Morgan pursuant to a trust indenture naming Morgan as trustee which had been executed in connection with a loan made to REA by the Equitable Life Assurance Society of the United States ("Equitable"). Carr & Co. was also a nominee and was holding the stock for another third party creditor of REA.

By its letter of July 1, 1971, Interway informed REA (1) that the written consent of these holders of record was necessary before Interway could proceed with the registration, and (2) that the convertible preferred shares "must be converted into common shares before further efforts can proceed to register the common stock." REA claims that Interway's insistence upon conversion before registration constituted a breach of the October 11, 1968 Letter Agreement.

There can be no doubt that REA had the right to request a registration of the common stock which would be received upon the conversion of the preferred. Interway obviously had a correlative duty under the Letter Agreement to use its best efforts in connection with the registration. But Interway also had a responsibility to follow the provisions of its Certificate of Incorporation, and stockholders like REA must hold their shares subject to the provisions in the Certificate. *Breswick & Co. v. Harrison-Rye Realty Corp.*, 2 A.D.2d 769, 154 N.Y. S.2d 625 (2d Dept. 1956), *aff'd.*, 4 N.Y.2d 685, 171 N.Y.S.2d 81, 148 N.E.2d 299 (1958). Paragraph 4(e) of the Certificate states:

> "Shares of Preference stock shall be convertible, at the option of the holders thereof, at any time at the office of the corporation in New York, New York, into fully paid and non-assessable shares of Common Stock at a price of $66⅔; . . . ."

█ Conversions can occur only when the *holders* of the preference shares exercise their option to convert. Furthermore, the "holders" referred to are the shareholders *of record.* In matters pertaining to important corporate actions such as a registration or a con-

version of preferred stock into common which must necessarily affect the rights of the preferred shareholders, a corporation is entitled to deal in all respects with its shareholders of record. *Pierre J. LeLandais & Co., Inc. v. MDS–Atron*, 387 F.Supp. 1310, 1317 (S.D.N.Y.1974); *Todd v. Maryland Casualty Co.*, 155 F.2d 29 (7th Cir. 1946). Fletcher, Cyclopedia Corporations, § 5306 (1971 ed.).

Here, Interway had the right to insist upon consent of the holders of record to a conversion of the preferred stock. To tender merely the consent of pledgors or beneficial owners such as REA would be to undermine the position of lending institutions and other pledgees who here have taken the preferred stock relying theoretically at least in part upon the superior dividend, liquidation and redemption rights which the preferred enjoyed over the common. In this case the lenders were so relying. The parties have stipulated that one McCurdy of Equitable telephoned Irving Jenkins of REA on August 12, 1971 to advise him that Equitable would not release the certificates, and would not give its nominee, Kugler & Co., unqualified approval to convert at that time. Equitable wanted to protect its security interest as trustee, and was concerned about Interway's financial position. McCurdy pointed out that the preferred stock had a liquidation value of $100.00 per share and the common stock had no value on liquidation.[9]

Interway thus had a legitimate interest in obtaining the consent of the holders of record before proceeding with the conversion of the preferred and subsequent registration of the common. Since the actual physical act of conversion could not take place until the holders of record delivered the preferred certificates to Interway's offices, it was implicit in the Letter Agreement that any re-

quest for conversion would be made (or at least consented to in writing) by the holder of record of the preferred shares, whoever that might be. REA never furnished the written consents of the holders of record and without them its request for registration was fatally deficient. Under these circumstances it cannot be said that Interway breached the Agreement to register.

Therefore, on Counts II and III, I find for the defendants.

*The Counterclaim.*

 The plaintiff warranted both the collectability of Realco's accounts receivable and the absence of any liabilities not reflected or reserved against in its audited financials of June 30, 1968. These warranties were breached, and the defendant is entitled to recover on its counterclaim, subject to the loss deductible provision as to the first $50,000.00.

In paragraph 4 of the Purchase Agreement the seller, i. e. REA, made several representations and warranties. This paragraph states in relevant part:

"4. *Representations of Seller.* Seller represents, warrants and agrees as follows:

\* \* \* \* \* \*

(c) Seller has furnished to Buyer a true and correct copy of the audited consolidated balance sheet of Realco and subsidiaries, as of June 30, 1968, and the related statement of income and retained earnings for the year then ended, together with the related report of Peat, Marwick Mitchell & Co., independent public accountants. *Said financial statements are true and correct. Except to the extent reflected or reserved against* in the consolidated balance sheet as of June 30, 1968, *Realco, as of the date thereof, had no liabilities or obligations of a*

---

9. McCurdy did go on to state that Equitable would give the necessary approval for the conversion of the stock at the time the registration became effective. However, it is obviously impractical to proceed with the difficult and expensive process of registering common stock (which is to be issued only upon the

actual exercise of the conversion privilege) upon the mere oral promise of the lender controlling the holder of record of the preferred that he will convert at the proper time. In any event, there is no evidence that Equitable had any direct communication with defendants on this subject.

*nature customarily reflected in a corporate balance sheet prepared in accordance with generally accepted accounting principles, . . . As of June 30, 1968 Realco had no liabilities of any nature contingent or otherwise not fully reflected or reserved against in its consolidated balance sheet as of June 30, 1968.* [Emphasis added].

\* \* \* \* \* \*

(f) None of the accounts and notes receivable of Realco reflected in the consolidated balance sheet of Realco and subsidiaries as of June 30, 1968, are subject to counterclaims or set-offs and all of such accounts and notes receivable are (to the extent not collected since June 30, 1968) good and collectible at the aggregate recorded amounts thereof, less the amounts of the applicable reserves or allowances reflected in said consolidated balance sheet for doubtful accounts, overcharge, noncollectible items and for allowances and discounts."

There was $9,540,582.00 in accounts receivable listed on the June 30, 1968 financials, and a reserve of $152,885.00 for uncollectible items. Under the warranty in paragraph 4(f), REA was responsible for any excess of uncollectible accounts over the reserve.

During trial, counsel stipulated that items 2, 4 and 9 of Defendants' Ex. P, totalling $116,342.00 of claims against the Tennessee Central Railroad, the Central Railroad of New Jersey and REA itself were uncollectible accounts of Realco for which REA would be liable under its warranty. In addition, I find that $34,940.00 and $11,300.00 (items 3 and 10) due respectively from the Penn Central and Lehigh Valley Railroads as of June 30, 1968 were also uncollectible. Both of these railroads are presently bankrupt. REA's contention that these balances could have been collected because these railroads were paying current bills is refuted by the testimony of Mr. Pluemer, Realco's controller, who stated that there were inherent delays for as long as three years in billing and collecting the receivables. This was due to the nature of Realco's business, which is similar to the interchange of rolling stock among railroads. REA was aware of these delays, and it also knew that Realco's practice was to apply payments which were received, not to the oldest outstanding accounts, but only to those receivable claims which had already been identified. This is normal railroad accounting practice.

I also find that items 5 through 8 on Defendants' Ex. P were within the warranty of paragraph 4(f) of the Purchase Agreement. REA's argument that it never warranted these estimated, as opposed to identified, receivables for the years 1965 through June 30, 1968 is specious, in view of the fact that the financials, incorporated by reference into the warranty, contain a footnote stating that the receivables were derived from revenue estimates. Mr. Pluemer testified, and I find, that most of Realco's Nine Million Dollars in receivables as of June 30, 1968 were estimates. To read the express warranty as REA proposes would be to strip it of any real meaning. The language states that the accounts are "good and collectible at the aggregate recorded amounts thereof," less the applicable reserves. The evidence shows that for the period 1965 through June 30, 1968 Realco overestimated its accounts receivable by $31,803.00, and that this amount subsequently had to be written off. It should be pointed out that this figure is net, arrived at by taking the total of overestimates ($220,915.00) and subtracting a favorable adjustment for 1967, when Realco collected $189,112.00 more than it had estimated.

Defendants should also recover for items 11 and 12. These amounts, respectively $37,155.00 and $12,073.00, represent pre-June 30, 1968 accounts which Realco was unable to collect because it could not identify the customers to be billed. These items had to be written off because despite a request from Realco, REA never supplied the information which was needed to identify these cus-

tomers. Under its warranty REA must make good on these write-offs.

The total net amount of uncollected receivables which REA warranted as good and collectible is $243,613.00. From this amount must be deducted $152,-885.00, the reserve which was set aside in the financial statement. The difference, *i. e.* $90,728.00 is the amount of damage which Interway suffered because of REA's breach of the warranty in paragraph 4(f).

REA also breached the warranty contained in paragraph 4(c). It had liabilities which were not fully reflected or reserved against in the balance sheet of June 30, 1968. It had excess accounts payable in the amount of $49,236.00 owing to firms which repaired its trailers. There was no accrual for such repair expenses in the financial statements. The evidence shows that Realco had to pay the full amount of the repairs and that there was no contra charge against the railroads leasing the equipment.

In addition, there was an excess liability for equalization allowances in the amount of $37,508.00. Equalization payments were basically rebates, which Realco granted to certain railroads as an incentive to sign up for a long term leasing program at a lower rate than the normal daily interchange rate. The financial statements reflect an accrual for equalization in the amount of $123,-604.50. The total amount of equalization actually granted was $461,368.50, or an excess of $337,764.00 over the allowance. However, as the defendants themselves have recognized, this excess figure must be adjusted downward to reflect increased revenues. Realco's obligation to pay so much more in rebates than had actually been set aside could only mean that it had underestimated the related revenues which it was generating. Thus the accountants adjusted upward both its estimated revenue and the allowance for equalization by $300,255.00. However, this left it $37,508.00 short of the amount actually paid for equalization generated during the period prior to June 30, 1968. The defendants should recover this sum of $37,508.00 for the breach of the warranty in paragraph 4(c).[10]

Defendants have also claimed that there were non-existent physical assets carried on the financial statements in the amount of $135,107.00 and that they should recover this amount for the breach of the warranty of correctness of the financials, set forth in paragraph 4(c). However, Mr. Pluemer admitted that the financials were true and correct, notwithstanding this variance. It appears that generally accepted accounting principles were consistently applied by Peat, Marwick, Mitchell & Co. in preparing the financials. I find that the balance sheet was substantially true and correct as warranted and that a mistake of $135,107.00 in computing assets with a total value of $34,000,000.00 is *de minimis* and does not constitute a breach of the warranty in paragraph 4(c).

Unlike the warranty in ¶ 4(f) relating to receivables, which I have held should be construed liberally in favor of the purchaser, the warranty of correctness is merely a representation that the figures in the financial statements were arrived at through the use of generally accepted accounting principles. The purpose of using such principles is to obtain a clear and accurate picture of the position and performance of the business. Accomplishment of that purpose does not entail precise measurement down to the last penny. To require such would be to impose a burdensome standard of liability which the parties did not contemplate when they drafted the language in paragraph ¶ 4(c), so different in form from the warranty in ¶ 4(f).

Defendants' damages for uncollectible accounts receivable and excess liabilities (equalization and trailer repairs) amounts to $177,472.00. The Purchase Agreement did, however, contain a pro-

---

10. See testimony of Pluemer (Transcript pp. 293–304) for a more complete explanation of equalization.

vision which arguably limits the buyer's recovery for breach. Paragraph 8 in relevant part reads as follows:

"8. *Indemnification.* Seller further agrees to indemnify and hold Buyer harmless from any and against all liability, loss or expense in excess of an aggregate of $50,000 arising out of any misrepresentations, breaches of warranties or failure to fulfill any covenants of Seller under this Agreement or arising out of any misrepresentation or material omission from any certificate, opinion or other instrument furnished to Buyer by Seller or Realco under this Agreement. Seller will reimburse Buyer on demand for any payments by Buyer with respect to any liability, obligation or claim to which the foregoing indemnity relates, provided Buyer has notified Seller in writing promptly upon the assertion of any such claim or demand by others and has afforded Seller the opportunity to defend against any such claim or demand."

REA contends that this clause applies to the present situation involving breaches of warranties and thus that Interway must bear the first $50,000.00 of losses. Defendants claim that the nature of an indemnity is reimbursement for losses arising out of claims asserted by third parties, and that since no such third party claims are involved here, the clause should be inapplicable.

I decline to read the clause as narrowly as the defendants suggest. While the clause is somewhat ambiguous, I conclude that a fair construction would make it applicable both to third party claims and disputes between the Buyer and Seller arising out of breach of warranty as therein specifically provided. Although the clause contains extensive provisions of indemnity, relevant only to third party situations, it also provides for "holding harmless" from losses, like those asserted in the counterclaim, arising out of any breaches of the warranties in ¶ 4. The Court finds from all of the evidence, and relying on the general business context of the agreement, that ¶ 8 is a loss deductible provision whose purpose was to prevent litigation over trivial amounts in a $32.4 million cash transaction. Accordingly, I find that the defendants must bear the first $50,000.00 of their damages proved under the counterclaim.

The defendant Interway is entitled to judgment on the counterclaims in the sum of $127,472.00. I decline as a matter of discretion to grant pre-judgment interest. Defendants waited almost three years to give notice of these claims, which in large measure appeared in the audit which was conducted immediately following the original transaction.

On February 18, 1975, while this action was pending before me, plaintiff filed a petition in this Court pursuant to Chapter XI, § 322 of the Bankruptcy Act. Pursuant to Rule 11–44 of the Rules of Bankruptcy Procedure, Bankruptcy Judge Galgay entered an order on February 18, 1975 specifically staying continuation of all pending court proceedings, including the counterclaim of defendant Interway in this action. On February 26, 1975 Bankruptcy Judge Galgay modified his original order so as to permit Interway to prosecute its counterclaim. However, Judge Galgay's order, as so modified, enjoins Interway from executing upon or seeking to enforce any judgment which may be entered in its favor in this action, unless first so authorized by the Bankruptcy Court.

On November 6, 1975 the Chapter XI petition was dismissed and REA was adjudicated a bankrupt. On November 7, 1975 Bankruptcy Judge Galgay entered another order staying REA's creditors from enforcing any judgment against the bankrupt.

Accordingly, the judgment to be entered herein shall provide that no execution or levy may be made upon any of REA's property unless and until specifically authorized by the Bankruptcy Judge having jurisdiction over REA's affairs.

The foregoing, together with the stipulated facts not inconsistent therewith set forth in the Pre-Trial Order dated February 3, 1975, and the additional Stipulation of Facts also dated February 3, 1975 together constitute the Findings of Fact and Conclusions of Law pursuant to Rule 52, F.R.Civ.P.

Settle judgment on notice to counsel appearing in this action, and also on notice to the trustee in bankruptcy of REA, or his attorney. No costs.