**PRITCHARD SERVICES GROUP OF AMERICA, INC. and Nation-Wide Building Services, Ltd., Plaintiffs,**

v.

**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION and ITT Canada Limited, Defendants.**

No. 79 Civ. 3951 (JMC).

United States District Court, S.D. New York.

March 29, 1985.

Donovan, Leisure, Newton & Irvine, New York City (Kenneth E. Newman, Richard W. Mark, John D. Worland, Jr., New York City, of counsel), for plaintiffs.

Cahill Gordon & Reindel, New York City (Thomas F. Curnin, Thorn Rosenthal, New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

After a nonjury trial on the merits, the Court finds for defendants.

## BACKGROUND

Plaintiffs instituted this action charging defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder by the Securities and Exchange Commission.[1] Plaintiffs also allege defendants' violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), New York's anti-fraud statute, N.Y.Gen.Bus. Law § 352–c, and common law fraud. Because the language of the state statute and the common law prohibitions against fraud are substantially similar to the scope of Rule 10b–5, plaintiffs main thrust throughout the trial was directed at the violation of federal laws.

This action arises out of defendants' sale of the entire stock of ITT Service Indus-

---

**1.** 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

tries Corporation ["ITTSI"] and Allied Building Services of Ontario, Limited ["ABSO"] to plaintiffs on November 1, 1978. On that date, plaintiffs paid a total price of $8,000,000, representing net tangible assets plus $500,000. Pursuant to the Purchase Agreement ["Agreement"], the value of the net tangible assets was ultimately to be decided after the closing by the parties' accountants. They reached agreement on a figure of $7,678,678—a final purchase price of $8,178,678.

Plaintiffs claim a fraud based upon misleading representations and omissions by defendants that induced their purchase of ITTSI stock. Plaintiffs seek damages in the sum of $2,875,000, which allegedly represents the difference between the price paid plus transaction-related costs and the fair market value of ITTSI stock on November 1, 1978. Defendants seek judgment of $178,678 plus interest from August 2, 1979 on their counterclaim for the balance of the purchase price.

After a thirteen-day trial on issues of liability and damages, and the numerous documents, briefs and arguments ably and cogently submitted by counsel, the Court makes the following findings of fact and conclusions of law:

*The Parties*

Plaintiff Pritchard Services Group of America ["PSGA"], a Nevada corporation and plaintiff Nation-Wide Building Services, Ltd., a wholly-owned subsidiary of Pritchard Services Group of Canada, Ltd., a Canadian corporation, are both controlled by a publicly-held Great Britain corporation, Pritchard Services Group, PLC ["PSG"]. PSG's principal business is building maintenance. Plaintiffs are referred to collectively as "Pritchard".

Defendant International Telephone and Telegraph Corporation ["ITT"], a Delaware corporation with its principal place of business in New York and defendant ITT Canada Limited ["ITT Canada"], a Canadian corporation wholly-owned indirectly by ITT, are referred to collectively as "ITT". ITTSI and ABSO [collectively "ITTSI"] were wholly-owned subsidiaries

of ITT and ITT Canada before their sale to Pritchard. ITTSI's name was changed to Pritchard Services, Inc.

*Principal Actors*

Peter Pritchard is chairman of the board of PSG and PSGA. He was Pritchard's chief negotiator in the acquisition of ITTSI. Curtis Roberts is an executive at PSG and has been responsible for operating PSG companies in foreign countries.

Stanley Luke, the principal negotiator for ITT, was an ITT executive vice-president and headed its acquisition and divestitute program. David Davidson was ITTSI's president at the time of its sale. James Kelley, a certified public accountant with ITT, was responsible for providing financial information about ITTSI to Pritchard. Walter Domeracki was manager of financial controls of ITT's building services division and was responsible for the accounting systems and controls utilized by ITTSI. Gabor Mezei was the comptroller for ITTSI's Building Services Division. William Bramwell was an ITT staff attorney who handled legal aspects of the ITTSI transaction.

*The Transaction*

In 1976, PSG instructed Roberts to investigate building service companies in North America for potential acquisition. PSG wanted to build a cleaning services business by purchasing several companies in various geographical areas. Roberts and Peter Pritchard were sophisticated in the operation and acquisition of building services businesses. They had reviewed the financial records of hundreds of potential targets, had operated subsidiaries around the world, and had recently purchased businesses in Australia and the Far East. In November 1977, PSG acquired a building maintenance company in Puerto Rico.

Roberts initially contacted ITT in April 1978 about the possible purchase of ITTSI. Pritchard and ITT conducted several negotiations during the summer of 1978. The principal meetings were in London, England on July 17, 1978 and in New York City on August 29, 1978. The parties also con-

ducted negotiations by mail, telex and telephone. Pritchard made extensive investigations into ITTSI and received detailed financial and other information from ITT.

ITTSI, comprised of approximately thirteen separate companies acquired by ITT, was primarily involved in the building services business. Its other unrelated operations were transferred to ITT before the sale to Pritchard. The Agreement for the ITTSI stock became effective on November 1, 1978. ITT's representations and warranties in the Agreement concerning financial statements, PX 9, ¶ B.6;[2] the absence of any adverse change in the condition of ITTSI's business, PX 9, ¶ B.16; and the accuracy and completeness of all representations, warranties and information provided by ITT, PX 9, ¶ B.17, explicitly did not survive the closing. PX 9, ¶ J.1.

*The Parameters of the Lawsuit*

Plaintiffs assert that they were wrongfully induced to purchase ITTSI because they were defrauded by defendants' false and misleading representations and omissions of material fact. These allegations can be categorized generally under one main claim concerning the break-even operating rate and three tangential claims regarding financial information, goodwill, and internal accounting and assessments. The Court will analyze separately the factual basis of the allegations in each category with regard to whether the misrepresentations and omissions were material, plaintiffs detrimentally relied on material (dis)in-

formation, and if necessary, the proof of scienter.

The Court notes that the issues of reliance and materiality are intertwined for each separate allegation, *see Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33–35 (2d Cir.1976) and also recognizes that its conclusions of law on materiality are properly decided after compiling all the evidence to determine whether a reasonable investor would view the omissions/misstatements "as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The Court finds, however, that plaintiffs have failed to prove a violation of securities laws under the separate categories or in the case as a whole.

"Although a judicial review of alleged material misstatements or omissions should not become an exercise in 'nitpicking'," *Pantry Pride v. Rooney*, 598 F.Supp. 891, 901 (S.D.N.Y.1984) (quoting *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir.1978)), the Court will examine in some detail plaintiffs' relevant specific allegations. The Court's findings of fact and conclusions of law track those proposed by defendants for the simple reason that the Court found their witnesses credible. Plaintiffs' principal witnesses, Roberts and Pritchard, were not straightforward on several occasions.[3] The

---

**2.** The following abbreviations are used: Plaintiff's Exhibit ["PX"]; Defendants' Exhibit ["DX"]' Joint Exhibits ["JX"]; and citations to the trial transcript are in the form "[witness name] Tr. at page."

**3.** Pritchard's trial testimony on whether Luke represented that ITTSI was operating at a break-even rate at the August 29, 1978 meeting conflicts with Luke's testimony and Pritchard's pretrial deposition. *Compare* [Pritchard] Tr. at 541–50, 631–32, 1173–76 *with* [Luke] Tr. at 1212–13 *and* [Pritchard] Tr. at 652, 1175–79 (Pritchard deposition). Pritchard's testimony that he would not have gone through with the deal if ITTSI was not operating at a break-even rate, *see* [Pritchard] Tr. at *id.*, is belied by a written contemporaneous report made by Pritchard's Chief Financial Officer after discussions with Pritchard on August 31, 1978:

Following [Pritchard's] visit to the States on Monday 28th August verbal agreement has now been made with Luke of I.T.T. re acquisition of I.T.T.S.I. as follows:

. . . .

*Profits/Losses*
Luke said that the present President Davidson had said that the company would break through to break even in August and that he felt there would be a small profit [for] September/December *although it is our opinion that there will be a loss for that period.*
DX BM (emphasis added).

Roberts' testimony on the significance of the goodwill write-off, [Roberts] Tr. at 99, is contradicted by overwhelming evidence that Pritchard was aware of this disclosure prior to closing. *See* DX BV, BX, BW; [Bramwell] Tr. at 1267–68; [Kelley] Tr. at 456; [Pritchard] Tr. at 1160–

Court specifically noted at trial that Pritchard had "a pathological block to answer[ing]" [Tr. 620] certain questions and that at various times he "sound[ed] to me like Alice in Wonderland." [Tr. 1170]. The Court finds both Roberts and Pritchard to be incredible on many issues, and, like a bad egg in an omelet, it spoils their entire testimony, even when taken with a grain of salt.

### BREAK–EVEN OPERATING RATE

*Misrepresentations/Omissions*

ITT represented to Pritchard on several occasions prior to the closing, orally and in writing, that ITTSI was operating at or near a break-even rate and that it was in the process of "turning around" from its financial difficulties of previous years. These representations were made at the initial meeting in April 1978, [Kelley] Tr. at 412–13, PX 1, 9; the June 27, 1978 meeting between Pritchard's agent, A. Theodore Barron and ITT, [Kelley] Tr. at 436–37, [Luke] Tr. at 1197–98, JX 3 (Luke Deposition at 115); the July 17, 1978 meeting in London, [Roberts] Tr. at 40, [Pritchard] Tr. at 536–37, 572; the meetings in New York during the first week of August 1978, [Davidson] Tr. at 1687–88; the August 29, 1978 meeting in New York, [Davidson] Tr. at 1689–90, [Luke] Tr. at 1216–18; and PSG's press release to its shareholders and others on November 1, 1978, the language of which was approved by ITT and states in relevant part that "management infor-

mation made available to [PSG] shows that ITTSI is currently near to a break-even operating rate." PX 11.

The crucial document affecting the break-even operating rate—Pritchard's principal allegation of fraud—is ITT's set of pro forma financial statements, dated August 31, 1978, which show an eight-month loss for ITTSI of $318,000. PX 8. Plaintiffs assert that the break-even representations, supported in large measure by the minimal $318,000 loss [$39,750/month], were false because of hidden losses. They point to four factors supporting their contentions. Initially, ITT filed losses for ITTSI as of October 31, 1978 in the amount of $1,302,372 on its 1978 federal income tax return. PX 36; [Domeracki] Tr. at 685–86; [Mezei] Tr. at 1660–61. Second, ITTSI's certified audit report confirms a pre-tax loss of $1,822,366 for 1978, including the $1,302,372 loss for the first ten months. DX CD. Third, Pritchard maintains that $884,000 of the $1,302,372 loss for the first ten months is directly attributable to losses from ITTSI's continuing operations.[4] Finally, Pritchard calculates that ITTSI would have lost $160,000 in November and December 1978 had it continued to operate in the same manner as the preceding ten months.[5]

Reduced to simple terms, Pritchard maintains that ITTSI lost $884,000 on a continuing basis for the first ten months of 1978 [$88,400 monthly loss],[6] which is allegedly a misrepresentation from the August pro formas showing a $318,000 loss for the

---

63. Roberts also gave conflicting testimony and reports concerning the attempt to retain Richard Starke at PSI. *Compare* [Roberts] Tr. at 87–88 (wanted Starke to stay on) *with* DX Q at 48 (Roberts Deposition) (no attempt to retain Starke) *and* DX R at 3 (Roberts 1979 report) (attempted to retain Starke) *and* [Davidson] Tr. at 1692–93 (Roberts did not want to retain Starke). Additionally, Roberts partially disavowed the accuracy of documents reflecting the two-month operation of ITTSI for November and December 1978 even though they were prepared for Pritchard, and one document was based in part on discussions with Roberts in Dallas. [Roberts] Tr. at 2051–66; DX DJ, DK.

4. The Court finds that an $888,000 loss for continuing operations is the result when using

Pritchard's calculations. The $414,000 discrepancy reflects ITT internal charges of: $105,000 for contract service charges; $103,000 for imputed interest; $21,000 for the exclusion of ABSO profit; and $185,000 for the Bulkley building leasehold improvements.

5. Pritchard calculates that of the $519,994 loss recorded for November and December 1978 in the certified audit report, only $360,000 reflected costs and savings occurring solely because of the sale, thereby leaving a projected $160,000 loss.

6. The Court adheres to a $88,800 projected monthly loss, *see* note 4 *supra*, which is more favorable to plaintiffs.

first eight months, or a ten-month loss projection of $397,500. The Court notes that measuring from the first closing of ITTSI's books in mid-November 1978, when Pritchard was in actual control of the company, the loss for the first ten months was recorded as $378,000. DX CY, [Andrew J. Capelli] Tr. at 1732–33; [Domeracki] Tr. at 1325. This loss averages to $37,800—an *improvement* of the $39,750 monthly loss projected by the August pro formas. The Court finds that these initial figures, consistent with ITT's breakeven representations, are accurate and reflect the actual financial condition of ITTSI. Pritchard's attempt to stretch the $378,000 figure to $884,000 grows almost entirely out of year-end accounting procedures, which are disproportionately bloated by Pritchard's extraordinary closing procedures.

The Court initially notes that $208,000 of internal ITT charges, recognized by plaintiffs as falling outside the ambit of the $884,000 continuing loss figure, PX 48, may have been restated inadvertently in its $607,000 figure representing ITTSI's initial loss from continuing operations before adjustments. DX CY, col. 2. The $607,000 figure forms the base figure from which plaintiffs adjust upwards to $884,000. PX 48.

The August pro formas, covered by the accuracy and no adverse change clauses of the Agreement, are also affected by two disclaimers. The first disclaimer is that the "interim pro-forma financial statements were prepared from the books of account and records of ITTSI, its Subsidiaries and ABSO, but have not been subjected to the same review and analysis afforded the year-end financial statements." PX 9, ¶ B.6(b). Thus, plaintiffs are on notice that this information was taken from ITTSI's books without further analysis or adjustment procedures. [Roberts] Tr. at 662–63, 1302–10; [Capelli] Tr. at 1724–25. The second disclaimer is that the pro formas "may

require modification to comply more accurately with the closing methods employed in the preparation of the annual statements. [ITT] does not believe that such modification, if any, of the interim statements would have a material effect on the financial condition ... of ITTSI ... for the interim period." PX 9, ¶ B.6(b).

ITTSI's practice was to keep its books open for approximately one month at a year-end closing. [Domeracki] Tr. at 1337. Pritchard, however, kept ITTSI's books open until approximately February 10, 1979, more than three times the usual length (102 days). This allowed Pritchard to record certain adjustments that would not have been picked up if the books were closed normally for review on November 1, 1978. Moreover, the purpose of the November 1, 1978 closing and subsequent negotiation of adjustments was to calculate net tangible assets in order to fix a purchase price, but was not meant to be used for determination of ITTSI's profits or losses for the first ten months. [Lang] Tr. at 873–74, 998. As a result of the $695,-000/$506,000 of adjustments booked retroactively by Pritchard for November 1, 1978, in excess of those initially established on November 15, 1978,[7] Pritchard was able to reduce the purchase price by $570,000. DX AM, CZ. The Court will address briefly the list of adjustments.

The initial adjustments for estimated accruals of vacation pay, payroll, state and local taxes, federal and state unemployment taxes, travel and entertainment, and health and welfare benefits resulted in a positive adjustment of $46,000 in ITT's favor, thereby resulting in an overstatement of losses on the August pro formas. As defendants correctly observe, this adjustment reflects a controlled and conservative accounting approach because ITTSI actually overaccrued for these adjustments.

---

**7.** Pritchard discovered $695,000 in adjustments, largely through unorthodox methods of valuation, which pumped the $607,000 ten-month loss figure for ITTSI—based on the $378,000 booking of November 15, 1978—to the final $1,302,- 372 figure claimed by Pritchard. DX CY. The Court is concerned with the $506,000 list of adjustments that increased the $378,000 booking to $884,000, the crucial continuing loss figure.

Pritchard adjusted the books to reflect a $45,000 entry for sick and severance pay. Forty-three thousand dollars of this figure is directly attributable to the TWA terminal contract, which according to generally accepted accounting principles is not booked until the time it is actually paid out. [Lang] Tr. at 908–10, [Domeracki] Tr. at 1345–49, [Mezei] Tr. at 1629–32, [Capelli] Tr. at 1742. The Court finds that because the termination of the TWA contract was not known until December 1978, $43,000 is properly reduced from Pritchard's adjustments. Additionally, because the entire amounts of the Diversified claim ($18,000), the Columbus lease repairs ($10,000) and the reserve for the Department of Labor in Corpus Christi ($28,000) were not known until December 1978 or January 1979, a total of $99,000 is reduced from Pritchard's adjustments. [James W. Needham] Tr. at 1923–25. The Court notes that Pritchard received a $92,000 reduction of the purchase price in respect to these adjustments ($45,000, $18,000, $10,000 and $15,000 [proportionately]). DX CZ.

Pritchard made a $206,000 adjustment for physical inventory of supplies and small tools. Approximately $113,231.33 [8] of this adjustment is directly attributable to Pritchard's new closing procedure and valuation methods, which do not reflect expenses or losses incurred in 1978. DX DB; [Capelli] Tr. 1751–60. The Court finds that at least $47,768.67 of the remaining adjustment figure is attributable to the adoption of new procedures and methods of valuation used by Pritchard, and accordingly, only $45,000 can be attributed to unrecorded shrinkage in 1978. [Needham] Tr. at 1927–29. Pritchard received a $206,000 reduction of the purchase price with respect to the inventory adjustment for supplies and small tools. DX CZ.

Pritchard made a $38,000 adjustment for physical inventory of fixed assets for which it received a $38,000 purchase price reduction. DX CZ. For purposes of the break-even operating rate, the Court finds that this deterioration should be spread over a five-year period with a resulting $6,333 loss adjustment for the first ten months of 1978. [Needham] Tr. at 1929–30. The Court notes that Pritchard was informed before the sale of the fact that ITTSI had never inventoried its fixed assets. [Domeracki] Tr. at 1343.

Pritchard made an $88,000 adjustment for accounts payable for which it received an $88,000 purchase price reduction. DX CZ. The Court finds that $54,000 of this figure resulted from Pritchard keeping the books open for over 100 days and that only $34,000 should be properly adjusted on a basis comparable to that used in previous years by ITTSI. [Capelli] Tr. at 1763–66; [Mezei] Tr. at 1629.

The $15,000 adjustment for the New York City Port Authority contract for which Pritchard received a $15,000 reduction in purchase price, DX CZ, is reduced because the contract was not terminated until March 1979 and did not affect ITTSI's operating rate. [Capelli] Tr. at 1737. The Court will allow a $10,000 adjustment to reflect a ten-month loss of the fifteen months' losses reflected by the contract. [Mezei] Tr. at 1636–37.

The $6,000 accrued bonus adjustment used by Pritchard is a proper adjustment. [Needham] Tr. at 1933.

The $98,000 New York City Credit Reversal claim is disregarded because it is an extraordinary item not subject to any closing or net tangible asset negotiation and because it was disclosed by Domeracki to Roberts and thence to Pritchard. PX 6, item 1.

The final tally shows a positive adjustment of $46,000 and negative adjustments of $2,000; $45,000; $6,333; $34,000; $10,000; and $6,000 for a total amount of $57,333 that arguably should have been reflected on the pro formas. The actual allegation of misrepresentation is that this new figure showing a $435,333 [$43,533/month] ten-month loss for ITTSI is a misrepresen-

---

**8.** This figure represents the proportionate elimination from the $206,000 adjustment when compared to the $123,672 elimination from the $225,000 overall adjustment.

tation of a breakeven operating rate based on the August pro formas showing a $39,-750 monthly loss. The Court finds, however, that the increase of monthly losses of $3,783 for 1978 was not a misrepresentation or omission.

■ The Court finds that ITTSI's losses of $33,783 per month in September and October 1978 are consistent with the breakeven representation of $39,750 (or $43,533) monthly losses reflected on the August pro formas. ITTSI was nearing a break-even operating rate on November 1, 1978, a finding supported by ITTSI's approximate $7,000–$10,000 profit results for November and December 1978. [Capelli] Tr. at 1786, 1878–79, [Needham] Tr. at 1917, [Roberts] Tr. at 2051–61; DX CB, CC, CD, DJ, DK; JX 318–23, 457–73 (Deposition of Kuthethur Rajogopal Rao).[9] Accordingly, the Court finds that the break-even operating rate representations and the documents provided by ITT accurately reflected ITTSI's financial condition and that the undisclosed adjustments were not "omissions" actionable under the securities laws.

*Materiality/Reliance/Scienter*

■ Assuming *arguendo* that the $5,733 monthly increase in loss reflects a misrepresentation/omission of the breakeven operating rate, there would be no materiality. Pritchard conceded at trial that a $25,000 adjustment would not be material. [Pritchard] Tr. at 1146–53. Moreover, at his deposition, Pritchard evaluated a projected $105,000 annualized profit projection reflected in the Barron report. Although the parties agreed before the closing that the Barron report was not credible, Pritchard maintained that "to be pedantic, making $105,000, if you are talking about a few nickels or dimes, then it is near to or break even." [Pritchard] Tr. at 1146.

Pritchard knew that ITTSI had lost $1.3 million in 1976 and $3.2 million in 1977. Its principal concern was to gain a foothold in the building maintenance business in North America. The evidence adduced at trial establishes that it was essentially immaterial to Pritchard whether ITTSI's losses on the interim financial statements were understated by significant amounts because Pritchard was relying upon its own expertise to swing ITTSI into profitability, a task at which it succeeded. Having successfully turned around other overseas loss situations in acquired companies, Pritchard trumpeted the benefits of the ITTSI purchase to its shareholders, directors, financiers and to the public on the basis of its ability to reverse ITTSI's then current loss position. PX 2, 11; DX A, AC, BQ; [Roberts] Tr. at 132–34, 218, 227–28, 257; [Pritchard] Tr. at 1140–41; [Needham] Tr. at 1908–11, 1918–19, 1984–85. Accordingly, for the foregoing reasons, the Court finds that Pritchard did not rely upon any representations or omissions made by ITT with respect to ITTSI's profits and losses as the basis for purchasing ITTSI. *See Titan Group, Inc. v. Faggen*, 513 F.2d 234, 236–39 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975); *REA Express, Inc. v. Interway Corp.*, 410 F.Supp. 192, 197–201 (S.D.N.Y.), *rev'd on other grounds*, 538 F.2d 953 (2d Cir.1976).

FINANCIAL INFORMATION

Plaintiffs assert that representations relating to financial information about ITTSI, which were provided to Pritchard, were fraudulent. ITT represented that its interim balance sheet of July 1975, PX 5, ITTSI's income statements for 1973, 1974, 1975, 1976, and 1977, PX 9, ¶ B.6(a), the August 1978 pro formas, PX 9, ¶ B.6(b), the Agreement, PX 9, ¶ B.6(b), and other financial information provided to Pritchard, [Roberts] Tr. at 51, were "prepared in accordance with generally accepted accounting principles ["GAAP"] consistently applied and present fairly the financial position of ITTSI and its subsidiaries." *Id.* The GAAP representation was coupled with the no material misrepresenta-

---

**9.** The Court notes that this profit figure of a minimum of $3,500 a month should be reduced by $3,783 to show a maximum average $283 monthly loss, certainly a break-even operating rate for a business with revenues approximating 50 million dollars.

tion/omission clause and the no adverse change clause. PX 9, ¶ B.17.

Plaintiffs' main objection is that the financial information provided to them did not comply with GAAP or opinion 28 of the Accounting Principles Board ["APB–28"]. PX 47–1. APB–28 applies to interim financial reporting and requires that interim statements "be viewed primarily as an integral part of an annual period." PX 47–1, ¶ 9. With respect to anticipated year-end adjustments, APB–28, PX 47–1, ¶ 17 provides:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount. Examples of such items include inventory shrinkage, allowance for uncollectible accounts, allowance for quantity discounts, and discretionary year-end bonuses.

The Court notes that no reference is made to APB–28 in any of the financial documents. Moreover, the Agreement provides that "interim pro-forma financial statements have been prepared using the same GAAP as those employed in the preparation of the annual financial statements [but that] [t]hese interim pro-forma financial statements have not been subjected to the same review and analysis afforded the year-end financial statements." PX 9, ¶ B.6(b). The Agreement also represents that the financial statements present fairly the operations of ITTSI, a requirement not found in APB–28. [Lang] Tr. at 951.

Plaintiffs' accounting expert conceded that APB–28 contemplates the use of estimates and acknowledges that there will also be year-end adjustments for companies. [Lang] Tr. at 948–49. The Court notes that four members of the accounting principles board dissented from the APB–28's principle that adjustments should be estimated and prorated during interim peri-

ods because they believe financial statements for any period should reflect only the events occurring during the reported period and should not be adjusted to predict expected results. PX 47–1 at 535. Additionally, there is a question whether APB–28 even applies to internal financial statements of nonpublic subsidiaries of public companies. [Capelli] Tr. at 1728, 1846–51.

■ After reviewing APB–28 and the other GAAP allegations, the Court finds that defendants' financial records accurately reflect ITTSI's finances and conform with accounting principles. This determination is supported by the Court's finding that the pro formas did not contain misrepresentations or omissions. There is no evidence that defendants' accounting procedures fell outside the ambit of GAAP, and more importantly, in view of the disclaimer and other relevant communications, plaintiffs can not establish any detrimental reliance. Accordingly, for the foregoing reasons, the Court finds that there was no fraud involved in the passing of financial information from ITT to Pritchard.

## GOODWILL

Plaintiffs maintain that ITT defrauded them through misrepresentations and omissions on the issue of goodwill. This areas was the most troubling to the Court during trial and a chronology of negotiating events is set forth: In the April 1978 meeting, Roberts was told that ITTSI had net tangible assets of approximately 7 million dollars not including 3 million dollars of goodwill. PX 1, ¶ 6. The ITTSI balance sheet given to Pritchard in May 1978 shows a $3,173,000 goodwill entry. PX 3. Similarly, the ITTSI balance sheet attached to the July 1978 letter of intent also shows the same entry for goodwill. PX 5. During the July 1978 meetings, Pritchard's negotiators were told that the goodwill represented the book figures for ITTSI. [Roberts] Tr. at 43; DX BR. Finally, the $3,173,000 goodwill figure was also entered on ITTSI's balance sheet given to Pritchard

at the August 29, 1978 meeting. PX 22; [Needham] Tr. at 2017–18.

Goodwill had been written off ITTSI's books in 1977 based on a deferred recommendation of its accountants, PX 39; DX DG; [Kelley] Tr. at 454–57, and was not carried on the books during 1978. At first blush, this clear misrepresentation would appear to be a crucial factor in the case. That Pritchard was made aware prior to the closing that goodwill had actually been written off is evidenced by the following: (1) an October 11, 1978 letter from ITT to Pritchard's counsel enclosing the accountant's statement that "All goodwill ... was charged to 1977 operations due to a diminution in value," DX BV; (2) an October 13, 1978 letter from Pritchard's counsel to Pritchard's accountants, forwarding the October 11 statement, DX BW; (3) Pritchard's November 1, 1978 letter to its shareholders wherein a charge of $3,193,000 against ITTSI's 1977 results is described as "goodwill amortisation and write-off", PX 11; (4) Pritchard's testimony that he was aware that goodwill had been written off prior to the closing, [Pritchard] Tr. at 1160–63; (5) William M. Bramwell's testimony that he informed plaintiff's counsel about the write-off in September 1978, DX BS, [Bramwell] Tr. at 1267–68; (6) Kelley's testimony that he also informed plaintiffs' counsel about the write-off in September 1978, [Kelley] Tr. at 456; (7) the revised August 31 pro formas, which deletd goodwill from ITTSI's balance sheet, PX 10; (8) the August 1978 balance sheet furnished to Pritchard, which did not include any entry for goodwill, DX BX; [Domeracki] Tr. at 1292–93.

During the negotiations for ITTSI, the purchase price was reduced by a $2,700,000 figure that ostensibly represented a reduced goodwill figure. This reduction was made in negotiations during the August 29, 1978 meeting and is reflected in the Agreement's final purchasse price of net tangible assets plus a $500,000 [goodwill] premium. The Court was troubled by these events because Pritchard did not know before the August 29, 1978 meeting that goodwill was off the books.

The principal negotiators for the parties, however, did not find that there were any problems. Luke maintained that the goodwill represented a premium, which although not on ITTSI's books, was includable in the company's net worth for sales purposes. [Luke] Tr. at 1190. In responding to the Court's inquiries, Luke testified that the $3,193,000 goodwill figure was a negotiating device. [Luke] Tr. at 1191. The *quid pro quo* for discounting $2,693,-000 from the $11,000,000 London negotiated price was:

> [T]he net result was that I said to Mr. Pritchard, "If in fact I go along with your proposal of no more than $8 million, and I give you this [goodwill] discount of $2.7 million, I want you to know that I don't want to hear any more about forecasts, or earnings, or any other financials. And I am giving you this discount in order to take care of all those things." And we agreed, and I said to him, "I am only going to give you three representations which will survive the closing. One is that we own the company. Another, that I will guarantee the receivables." The receivables by themselves on that balance sheet was worth $7 million. "I will guarantee the taxes and I will guarantee any insurance claims. But so far as we are concerned, Mr. Pritchard, this is the end. I am giving you these things to take care of the problems that you have raised here." and Mr. Pritchard understood it and he said, "That's fine."

[Luke] Tr. at 1192–93.

Pritchard testified that at the time of the closing he knew the goodwill had been written off. [Pritchard] Tr. at 1162. He also testified that the goodwill "was not an issue" [Pritchard] Tr. at 1163, that the $500,000 goodwill premium resulted from "long and arduous" negotiations with Luke, [Pritchard] Tr. at 1163–64, and was "part and parcel of the [$8,000,000] negotiated figure." [Pritchard] Tr. at 1165. The Court finds that the $500,000 goodwill premium actually represented the $50,000,000 of contracts on ITTSI's books, in addition

to the $7,500,000 net tangible assets, later determined to be $7,678,678.

■ Accordingly, for the foregoing reasons, the Court finds that any misrepresentations or omissions on the goodwill figures were not material and did not induce plaintiff to rely on them for purposes of the acquisition of ITTSI.

## INTERNAL ACCOUNTING/ASSESSMENTS

Plaintiffs allege that they were defrauded by a number of omissions regarding ITTSI's internal accounting practices and personnel assessments. Pritchard argues that evidence of ITTSI's weak internal accounting and control systems were withheld by ITT. Specifically, plaintiffs allege that (1) ITT failed to disclose that ITTSI's accounting system did not produce reliable information; (2) ITT failed to disclose that ITTSI had suffered a string of negative year-end adjustments ("Disastrous Decembers"); and (3) ITT failed to disclose that it had been unsuccessful in trying to restructure ITTSI's financial recordings.

Plaintiffs' allegations concerning the personnel assessments center on (1) ITT's failure to disclose a July 28, 1978 "personal and confidential" letter from Davidson to Luke wherein, *inter alia,* Davidson noted that ITTSI's "customer base is very fragile and existing relationships cannot be disturbed without serious risk of losing the accounts," PX 15, ¶ (a), and (2) ITT's failure to disclose the potential loss of ITTSI managers, PX 15, ¶ (c) ("we are *not* dealing with a stable, loyal, confident organization") (emphasis in original).

■ Pritchard's arguments on the accounting control systems, as defendants correctly observe, are irrelevant in light of the Court's finding that ITTSI was operat-

ing near a break-even rate as represented. The issue of accounting controls would only bear on scienter if the interim pro formas were materially misleading. In any event, although the yearend adjustments in previous years were not insignificant, they were not material facts affecting Pritchard's decision to acquire ITTSI.

The 1976 year-end adjustments of $844,000 involved a net of only $77,000 relevant to Pritchard.[10] Although the relevant 1977 adjustments, after excluding workmen's compensation and Parr Meadows adjustments amounts to $248,000,[11] DX AN; [Domeracki] Tr. at 742, the Court notes that the evidence adduced showed that ITTSI had tried to take a relatively conservative approach to the write-off of questionable assets. [Domeracki] Tr. at 736–37, [Mezei] Tr. at 1595–98; DX AO.

The Court is also satisfied that ITTSI made concerted efforts to clean up its financial recordkeeping through the hiring of new financial people, the implementation of new accounting policies and inventory procedures, monthly operations reviews and by an attempt to integrate the recommendations proposed by ITTSI's outside accounts.

Pritchard's allegations about the personnel assessments is meritless. The Davidson letter is a confidential memorandum concerning the necessity of maintaining effective operations during the divestiture discussions. Davidson intended to limit the circulation to Luke, L. Hamilton and J. Lester. JX 1 at 252–55. Pritchard, however, was aware of the fragile loyalty of ITTSI managers and the low employee morale. PX 6, DX BN, BO, BP; [Roberts] Tr. at 304–05.

*Miscellaneous Misrepresentations/Omissions*

■ The Court has reviewed other issues in this case that are only partially sub-

---

10. The Court finds that $676,000 attributable to workmen's compensation was necessary to reconcile ITTSI's accruals with its insurance carrier's liability estimates. [Domeracki] Tr. at 738–41. The $39,000 adjustment for pensions and the $52,000 adjustment for general liability insurance both related to internal ITT requirements.

11. Workmen's compensation is excluded for the same reasons as the 1976 adjustment. Parr Meadows is a non-building services operation of ITTSI sold back to ITT before the Pritchard acquisition.

sumed within the previous four categories. These issues include, *inter alia*, the Barron Report, [Kelley] Tr. at 433, [Luke] Tr. at 1197; field inventory, [Roberts] Tr. at 100–04; the accountants' compromise on various adjustments relating to ITTSI's continuing operations, DX BX; the effect of ITT's 1978 tax returns, PX 36, [Capelli] Tr. at 1726–27; the October 1978 western region audit report, DX CX; and ITTSI's budget projections, PX 11, DX AU, AV, AW, AX, AY, DT, DU, DV, DW, DX, DY, DZ, EA, ED.

Using the test set forth in *TSC Indus., Inc. v. Northway Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2132, the Court finds that these additional allegations, combined with those discussed in the four main categories, do not result in a significant alteration of the "total mix" of (dis)information presented to Pritchard. Additionally, the Court does not find that the elements of detrimental reliance or scienter have been proved.

### Other Issues

In light of the Court's findings of fact and conclusions of law, the Court does not address the issues surrounding damages or defendants' additional defenses to liability theories. The Court also does not make any finding with respect to defendants' assertions (1) about the relevance of the nonsurvival of representations/omissions concerning the financial statements and condition of ITTSI; (2) that the $2.7 million dollar reduction of the purchase price foreclosed this lawsuit; or (3) that the post-closing reduction of $570,000 in the net tangible assets, and therefore the purchase price, was Pritchard's exclusive remedy with respect to the allegations raised in its complaint.

### Counterclaim

The Court awards ITT judgment on its counterclaim for the unpaid balance of the purchase price—$178,678.00 plus interest from August 2, 1979, thirty days after the final determination of net tangible assets. DX X; PX 9, ¶ A.5(b)(i).

### Costs and Attorneys' Fees

█ ITT's motion for costs and attorneys' fees is denied. The Court notes the increasing and reflexive frequency with which Rule 11 motions are being filed in this District. Plaintiffs' claim had merit on its face and was not brought for malicious purposes. Although the original impetus behind the lawsuit appears to have arisen because ITTSI did not turn around as quickly as projected, plaintiffs' counsel carefully compiled its case and skillfully presented its version of the facts and law without any evidence of harassment or bad faith.

### CONCLUSION

Accordingly, for the foregoing reasons after a nonjury trial on the merits, the Court finds for defendants.

The foregoing constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Defendants are given Judgment on their counterclaim of $178,678 with interest from August 2, 1979.

The Clerk of the Court is directed to prepare and enter Judgment dismissing the complaint.

SO ORDERED.